UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Goddard, Inc., d/b/a
Freshway Food Systems,

Plaintiff,

vs. ORDER

Henry's Foods, Inc.,

Defendant. Civ. No. 01-1478 (RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 1st day of October, 2002.

## I. Introduction

This matter came before the undersigned United States Magistrate Judge, pursuant to the consent of the parties under Title 28 U.S.C. §636(c), upon the Plaintiff's Motion for a Preliminary Injunction. A Hearing on the Motion was conducted on May 8, 2002, at which time, the Plaintiff Goddard, Inc., doing business as Freshway Foods Systems ("Freshway"), appeared by Mark J. Arndt, and Richard L. Travis, Esqs., and the Defendant Henry's Foods, Inc. ("Henry's"), appeared by Warrenn C. Anderson, and Amy J. Doll, Esqs. For reasons which follow, we deny the Plaintiff's Motion.

## II. Factual and Procedural History

The parties' dispute arises from a previous business relationship between them. Freshway has been operating a deli-style food

FILED OCT 01 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

49

service since 1992, which included such menu items as deli-style sandwiches, salads, pizza, and chicken. See, Second Affidavit of Joan Goddard in Support of Motion for Preliminary Injunction, at ¶¶7-8 ("Goddard Aff."). The food goods are packaged, and sold, under the Federal service mark "Freshway Food Systems." Id. at ¶8. Freshway currently maintains ninety-two food centers, which are primarily located in convenience stores throughout the upper Mid-west, including twenty-three such stores in Minnesota. Id. at ¶¶9-10. Freshway franchises are purchased by local owners, most of whom are also convenience store owners and operators.[1] Id. at ¶11.

In contrast, Henry's is a grocery and food service distributor. See, Affidavit of Terry Loeffler, at ¶2, Ex. 32 to Defendant Henry's Foods, Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Loeffler Aff."). It has been a wholesaler since 1928, and it initially supplied retail outlets with products such as cigarettes, candy, paper products, miscellaneous supplies, and snacks, most of which were designed for resale. Id. Since 1987, Henry's has also been supplying retail food service products to its customers, including convenience stores, restaurants, drive-ins, and taverns. Id. Henry's

[1]As Joan Goddard, who is the president of Freshway, testified at the Hearing, prior to May of 2001, Freshway was a licensor, rather than a franchisor.

retail food service products include frozen, refrigerated, and dry groceries, that can be prepared in-store. Id.

Although Henry's had considered, in the mid-1990's, developing its own food service program for convenience stores, it determined that the niche had already been saturated. Id. at ¶3. Thereafter, in 1997, Henry's began delivering food products to Freshway's licensed distributors. See, Goddard Aff., at ¶14. As a result of this relationship, Henry's was provided with copies of Freshway's operations and sales manuals. Id. at ¶16. Henry's personnel also attended Freshway's training sessions. Id.

According to Henry's, during the next two years, it heard constant complaints about the quality and service of Freshway, and the high price of franchises, and branded concepts, in general. See, Loeffler Aff., at ¶3. Moreover, there was a disagreement between the two companies concerning the scope of the distribution agreement. Id. As a result, in 1999, Henry's initiated its Deli-Max program ("Deli-Max"), which offered pizzas, submarines and other sandwiches, salads, soups, chicken products, and bakery goods that owners could prepare in their stores, and sell as retail food service items. Id. In addition to former Freshway licensees, who had converted to Deli-Max, approximately seven other licensees or franchisees -- including Hot Stuff and Piccadilly -- have changed to Deli-Max. Id.

In November of 1999, in part due to Henry's own entry into the retail food service program, the distribution agreement, between Freshway and Henry's, was terminated by Freshway. See, Goddard Aff., at ¶17. Between February of 2000, and June of 2001, eight of Freshway's distributors/franchisees terminated their relationship with Freshway, and began operating Deli-Max stores. See, Loeffler Aff., at ¶11. These convenience stores were all located in Minnesota, in the following towns: Barnsville, Clara City, Detroit Lakes, Glenwood, Hancock, Onamia, Roseau, and Walker. See, Goddard Aff., at ¶22. The same eight convenience stores had previously been serviced by Henry's, when Henry's was operating as Freshway's food service provider. Moreover, according to Freshway, "[w]ith the exception of changing the name from Freshway to Delimax, the appearance of the eight stores that were converted to Delimax remained nearly identical to the stores' appearances when they were Freshway locations." Id. at ¶24. Specifically, Freshway points to the following characteristics as being "nearly identical":

A. Four main menu items: deli-style sandwiches, salads, pizza and chicken;

B. Deli-Max menus are substantially similar to those of Freshway in name, price and content;

C. Paper menus are used as customer order forms at both locations;

> D. The ingredient labels for Deli-Max food products are nearly identical;
>
> E. The profit analysis used to market Deli-Max to convenience stores is nearly identical to the profit analysis used by Freshway;
>
> F. "Frequent buyer club" punch cards are substantially similar to Freshway's[.]

Id. at ¶25.

All of these items were available to Henry's, when Henry's was a distributor for Freshway, and Freshway maintains that Henry's purposely copied the Freshway look, and concept, when it initiated its Deli-Max program in the referenced eight stores. Id. at ¶26.

In addition, between April 22, 2002, and April 28, 2002, Goddard visited seven of the eight locations, which converted from Freshway to Deli-Max. Id. at ¶27. At that time, she observed, at Koep's Gas & Diesel in Glenwood, Minnesota, that Freshway paper menus/order forms were displayed for customers, and a Freshway logo was displayed on a roadside billboard advertising services for Koep's convenience store. Id.; see also, Affidavit of Darin Nugteren in Support of Motion for Preliminary Injunction, at ¶¶4-5 ("Nugteren Aff."). Moreover, the stores in Detroit Lakes, and Hancock, still maintained a "Broaster Chicken" logo on their store windows, menu boards, awning and/or chicken boxes. See, Goodard Aff., at ¶27. According to Goddard, Broaster Chicken is a product sold by Freshway, but is not, to her knowledge, sold by Deli-Max.

Id. An employee of Freshway, Darin Nugteren ("Nugteren"), also visited the store in Hancock on April 25, 2002, and observed a food preparer, behind the Deli-Max counter, who was wearing a Freshway uniform. Nugteren Aff., at ¶10. Goddard and Nugteren also aver that, of the stores they visited, all of the now Deli-Max locations looked nearly identical, or "substantially similar," to the way they appeared when they were Freshway distributors. Goddard Aff., at ¶24; Nugteren Aff., at ¶¶7, 11, and 14.

Wendy Navratil ("Navratil"), who is the general store manager at the Y-Mart in Walker, Minnesota, testified that she has held that position since 1991, and she recalled that the store began its relationship with Freshway in about 1995. At that time, the store was selling submarine sandwiches, salads, and pizzas. She further related that, within the past three years, the Y-Mart has discontinued its relationship with Freshway, and has switched to Deli-Max, but that it continues to sell submarine sandwiches, salads, and pizzas.[2] The change from Freshway, to Deli-Max, was accompanied by the replacement of the Freshway logo on the store's awning, as well as the logo on the counter. Navratil also believed that the items on the menu board changed slightly, although the

[2]Navratil explained that the store sold many more food items, but that the branded food items were the sandwiches, pizzas, and salads.

actual look of the menu board, including the lettering and background, remained the same. She further observed that the Y-Mart continued to use menu slips for customers, like those used when it was a Freshway distributor. She testified, however, that there were no longer any Freshway logos in the store, and that the store has never used Freshway's operations manual with Deli-Max products.

Navratil also testified that the Y-Mart had a previous business relationship -- prior to the Freshway license -- with Henry's. In addition, prior to selling Freshway's branded foods, the store maintained a simple deli program, including a "Pepsi" menu board. She stated that, when Freshway began its license agreement with the Y-Mart, the store chose a layout that matched the store's own marketing scheme.

Scott Morrissey ("Morrissey"), who is employed by Henry's in Alexandria, Minnesota, also testified at the Hearing. He stated that Henry's maintained a non-branded food service, prior to the start of the Deli-Max program in 1999. He also testified that only one of the eight stores at issue -- the Barnsville store -- was not serviced by Henry's, prior to Henry's relationship with Freshway. He noted that Deli-Max had its own uniforms and, in response to Goddard's testimony and Affidavit, concerning the "Broaster Chicken" program, he stated that Deli-Max is affiliated with the

"Broaster Chicken" product, and that the stores in Detroit Lakes, and Hancock, vend that product.

Morrissey also testified that, just prior to the Hearing, he had learned that the Deli-Max store in Glenwood was using a Freshway menu. He called the store, and informed the personnel there to remove all Freshway menus, and to discard them. He also stated that he did not previously know that the Glenwood store was still advertising Freshway on a roadside billboard but, after speaking with an individual at that store, he learned that the owner of the store simply forgot about the sign, and that the owner would be correcting the problem immediately.

Morrissey explained that many of the items, that had been highlighted by Freshway as infringing, are not actually required by Deli-Max, but are, instead, adopted at the discretion of the individual stores. Specifically, although Deli-Max did provide uniforms and paper menus, the individual stores were not required to use those items, but could do so if they wished. The same was true for the Frequent Buyer punch cards. The individual stores also would select the type of menu items that they would sell.

In view of these events, Freshway sued Henry's, claiming false representations, a false designation of origin, infringement of a federally registered service mark, injury to business reputation, dilution of its mark, Federal and State common law service mark

infringement, Federal and State common law unfair competition, breach of contract, conversion, and interference with a prospective advantage. Complaint, at ¶¶34-50. The main issue presented by Freshway's request for injunctive relief is whether its trade dress, which consists of, among other things, "a unique retail environment which includes an open store design so that customers can see product categories from the moment they enter the store, a unique combination of fixtures, displays, locations, and a menu heretofore not utilized by any other retail company," has been infringed by Henry's. Id. at ¶5. Freshway's trade dress infringement claim is predicated on the fact that the eight franchises, which are here in dispute, have maintained the same "look" even though they switched from Freshway to Deli-Max.

## III. Discussion

A. Standard of Review. An Injunction is issued so as "to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." College Craft Cos., Ltd. v. Perry, 1995 WL 783612, at *7 (D. Minn., August 9, 1995), quoting Devose v. Herrington, 42 F.3d 471, 472 (8th Cir. 1994), citing in turn Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113 & n.5 (8th Cir. 1991)[en banc]. In deciding a Motion for injunctive relief, a Court must weigh: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm

to the moving party; (3) the balance between the harm to the movant if the injunction is denied and the harm to other parties if the injunction is granted; and (4) the public interest. See, Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999); Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999); Dataphase Sys., Inc. v. CL Sys., Inc., supra at 113.

"These factors are not a rigid formula." Bandag, Inc. v. Jack's Tire & Oil, Inc., supra at 926. Rather, when applying these factors, "'a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene.'" Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., supra at 601, quoting United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998), quoting in turn Dataphase Sys. v. CL Sys., Inc., supra at 113; see also, General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 624 (8th Cir. 1987)("[C]are must be exercised in balancing the equities, especially since a preliminary injunction motion is too early a stage of the proceedings to woodenly assess a movant's probability of success on the merits with mathematical precision.").

When seeking a Preliminary Injunction, the burden on the movant "'is a heavy one where, as here, granting the preliminary in-

junction will give [the movant] substantially the relief it would obtain after a trial on the merits.'" Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co., 997 F.2d 484, 486 (8th Cir. 1993), quoting Dakota Indus., Inc. v. Ever Best Ltd., 944 F.2d 438, 440 (8th Cir. 1993); see also, County Inns & Suites by Carlson, Inc. v. Two H.O. Partnership, 2001 WL 1587903 at *1 (D. Minn., November 19, 2001)("The party requesting the injunctive relief bears the 'complete burden' of proving all the relevant factors * * *."); Bloom v. O'Brien, 841 F. Supp. 277, 279 (D. Minn. 1993)("[T]he plaintiff bears the burden of proof concerning the four factors").

Accordingly, we are obligated to closely examine each of the requisite factors in order to determine if this is one of those instances in which the "extraordinary remedy" of an injunction is warranted. See, Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc., 815 F.2d 500, 503 (8th Cir. 1987); Jenson v. Eveleth Taconite Co., 139 F.R.D. 657, 667 (D. Minn. 1991). Of course, if preliminary injunctive relief is warranted, the grant of the Motion "does not bind the District Court or the parties in any further proceedings in [the] case, for adjudication of a motion for a preliminary injunction is not a decision on the merits of the underlying case." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., supra at 603.

B. Legal Analysis. The issue before us involves the distinctiveness of Freshway's trade dress which, as we have noted,

Freshway defines as "a unique retail environment which includes an open store design so that customers can see product categories from the moment they enter the store, a unique combination of fixtures, displays, locations, and a menu heretofore not utilized by any other retail company." Complaint, at ¶5. More specifically, Freshway points to its store design, its use of awnings, its color scheme, its menu design, its price structure, its ingredient labels, its "Frequent Buyer Club" punch cards, and its profit analysis, as evidence of its trade dress.[3] See, Plaintiff's Brief in Support of Motion for Preliminary Injunction, at 2, and 9 ("Plaintiff's Brief"). During the course of the Hearing, Goddard testified that Freshway's trade dress included the front counter design, the equipment package, the menu board, the menu itself, the photographs inserted into the menu boards, and the uniforms.

Freshway's Motion for Preliminary Injunction, however, is not only limited to the issue of its trade dress, but it also only

---

[3]Freshway has limited the issue before us by agreeing to direct its request for a Preliminary Injunction to end consumers, rather than to convenience store owners. Plaintiff's Brief in Reply to Defendant Henry's Foods, Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, at 4 ("Plaintiff's Reply Brief"). Therefore, the issue of Henry's use of similar profit analyses does not factor into our analysis, as a customer would never see such an analysis. The profit analyses may potentially be considered in regard to Henry's intent, however, which is a factor in deciding whether there is a likelihood of confusion.

concerns the eight stores which converted from Freshway, to Deli-Max. See, Plaintiff's Brief In Reply to Defendant Henry's Foods, Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction, at 4 ("Plaintiff's Reply Brief"). As such, although Freshway's appearance from store to store is not identical, as Freshway promoted flexibility with the store owners, which resulted in a variety of different store "looks," see, e.g., Exs. 2A (Hancock) and 3A (Clara City) to Complaint; Exs. 19 (Walker), 21 (Walker), 22 (Clara City), 23 (Glenwood), 24 (Hancock), 32K (Detroit Lakes), and 32L (Detroit Lakes), to Defendant Henry's Foods, Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction ("Defendant's Brief"), its argument is that the trade dress infringement arises from the use of the same "look" at these particular stores.

As a consequence, Freshway contends that the customers at each of those eight stores are going to be confused about the origin of the products sold at those Deli-Max outlets. Although Freshway has furnished little information which is specific to those eight stores -- other than photographs of the store layouts -- our analysis of the Plaintiff's Motion, of necessity, is largely limited to those locations. See, e.g., Aromatique, Inc. v. Gold Seal, Inc., 28 F.3d 863, 868 (8th Cir. 1994)("Because of Horne's admission that Gold Seal's products of 1986 do not infringe Aroma-

tique's trade dress, the accused products are limited to Gold Seal's Holiday Essence and Spring Essence sold after 1986."). With this in mind, we turn to the pertinent Dataphase factors. See, Dataphase Sys., Inc. v. CL Sys., Inc., supra at 113.

1. Freshway's Likelihood of Success on the Merits.

As we have already observed, Freshway's trade dress is the sole basis for its request for preliminary injunctive relief. Trade dress has long been protected under Federal Law. As the Supreme Court recently explained:

> The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.

TrafFix Devices, Inc. v. Marketing Displays, Inc., 532 U.S. 23, 28 (2001).

For years, the Courts have analyzed trade dress infringement under the general trademark infringement provisions of Section 43(a) of the Lanham Act, Title 15 U.S.C. §1125(a)(1)(A), which provides a cause of action for injury caused by the use of "any word, term, name, symbol, or device, or any combination thereof * * * which * * * is likely to cause confusion * * * as to the origin, sponsorship, or approval of his or her goods" "on or in connection with

any goods or services, or any container for goods * * *." See also, TrafFix Devices, Inc. v. Marketing Displays, Inc., supra at 29.

Congress confirmed this interpretation in 1999, by amending the Lanham Act to provide specific protection for trade dress. See, Title 15 U.S.C. §1125(a)(3) ("In a civil action for trade dress infringement under this Act for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."); see also, TrafFix Devices, Inc. v. Marketing Displays, Inc., supra at 29. Nonetheless, "[t]he difference between trade dress and trademark is no longer of importance in determining whether trade dress is protected by federal law." Aromatique, Inc. v. Gold Seal, Inc., supra at 868; see also, Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 773 (1992)("[Section] 43(a) provides no basis for distinguishing between trademark and trade dress.").

The Courts have defined "trade dress" as the "'total image of a product, the overall impression created, not the individual features.'" Children's Factory, Inc. v. Benee's Toys, Inc., 160 F.3d 489, 494 (8th Cir. 1998), quoting Insty*Bit, Inc. v. Poly-Tech Indus., Inc., 95 F.3d 663, 667 (8th Cir. 1996); see also, Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., supra at 601 n.3. For

example, a restaurant's trade dress can include "the shape and general appearance of the exterior of the restaurant," "the identifying sign," "the interior floor plan," "the appointments and decor items," "the equipment used to serve the food," "and the servers' uniforms." Prufrock Ltd., Inc. v. Lasater, 781 F.2d 129, 132 (8th Cir. 1986). Trade dress does not, however, provide a blanket protection "from a competitor's imitation of one's marketing concept." Aromatique, Inc. v. Gold Seal, Inc., supra at 868. Nor does it protect "the mere method and style of doing business * * *." Id. at 868; see also, Prufrock Ltd., Inc. v. Lasater, supra at 131-32 ("A franchisor does not have a business interest capable of protection in the mere method and style of doing business".).

Under the Lanham Act, in order to receive protection for trade dress, an individual must show three things: the identifying mark is distinctive and capable of being protected, as it is either inherently distinctive, or has acquired distinctiveness through secondary meaning; the trade dress is primarily nonfunctional; and there is proof of a likelihood of confusion. Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 209-14 (2000); see also, Two Pesos, Inc. v. Taco Cabana, Inc., supra at 769-70; Children's Factory, Inc. v. Benee's Toys, Inc., supra at 494; Insty*Bit, Inc. v Poly-Tech Indus., supra at 666. Each of these factors requires separate analysis, so we will outline the issues attendant to each

factor, and then turn our analysis to the particular circumstances of this case, as they relate to those factors.

a. Distinctiveness. To receive protection under the Lanham Act, Freshway must first show that its trade dress is distinctive. As the Supreme Court has explained:

> Nothing in §43(a) [of the Lanham Act] explicitly requires a producer to show that its trade dress is distinctive, but courts have universally imposed that requirement, since without distinctiveness the trade dress would not "cause confusion * * * as to the origin sponsorship, or approval of [the] goods," as the section requires. Distinctiveness is, moreover, an explicit prerequisite for registration of a trade dress under §2, and "the general principles qualifying a mark for registration under §2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under §43(a)." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 * * * (1992)[citations omitted].

Wal-Mart Stores, Inc. v. Samara Bros., Inc., supra at 210.

"Distinctiveness" can be proven in one of two ways: either the mark "is inherently distinctive," as "'[its] intrinsic nature serves to identify a particular source,'" id. at 210, quoting Two Pesos, Inc. v. Taco Cabana, Inc., supra at 768, or "it has developed a secondary meaning, which occurs when, 'in the minds of the public, the primary significance of the [mark] is to identify the source of the product rather than the product itself,'" id. at 211,

quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982).

To determine whether a mark is distinctive, our initial effort requires us to categorize "the mark as either generic, descriptive, suggestive, or arbitrary [or fanciful]." General Mills, Inc. v. Kellogg Co., supra at 625, citing Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1329 (8th Cir. 1985); see also, Stuart Hall Co. v. Ampad Corp., 51 F.3d 780, 785 (8th Cir. 1995). If a trade dress is suggestive, arbitrary, or fanciful, it is deemed inherently distinctive. See, Stuart Hall Co., Inc. v. Ampad Corp., supra at 785. A "trade dress that is inherently distinctive is protected under §43(a) without showing that it has acquired a secondary meaning." Two Pesos, Inc. v. Taco Cabana, Inc., supra at 767. In contrast, "[m]arks which are merely descriptive of a product are not inherently distinctive," see, id., and, thus, a showing of secondary meaning is necessary. See, Stuart Hall Co. v. Ampad Corp., supra at 785. Finally, marks that are generic are not protectible under the Lanham Act. Id.

In delineating between inherently distinctive trade dress, and mere descriptive trade dress, our Court of Appeals has stated:

> The distinction between suggestive and descriptive trademarks, and thus between distinctive and nondistinctive trademarks, was delineated in Abercrombie [& Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 9 (2nd Cir.

> 1976)]: 'A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods. * * * These definitions address the relation between the product and the trade dress, not the relation between the trade dress and the consumer. The question they present is whether, and how much, the trade dress is dictated by the nature of the product, not whether consumers remember or are struck by the design, or whether consumers associate the design with its source. If the specific design of the trade dress is only tenuously connected with the nature of the product, then it is inherently distinctive, and secondary meaning, which requires a showing that consumers attach significance to the trade dress as a source-signifier, need not be proven. If the design of the trade dress is dictated by the nature of the product, then secondary meaning must be proven.

Stuart Hall Co., Inc. v. Ampad Corp., supra at 786; see also, General Mills, Inc. v. Kellogg Co., supra at 625.

Our Court of Appeals appears to have implicitly endorsed the test that was enunciated in Seabrook Foods, Inc. v. Bar-Well Foods Ltd., 568 F.2d 1342, 1344 (C.C.P.A. 1977). See, Stuart Hall Co., Inc. v. Ampad Corp., supra at 786. In Seabrook, the Court stated that, "'[i]n determining whether a design is arbitrary or distinctive this court has looked to whether it was unique or unusual in a particular field, [or] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for

the goods.'" Id., quoting Seabrook Foods, Inc. v. Bar-Well Foods Ltd., supra at 1344; see also, Children's Factory, Inc. v. Benee's Toys, Inc., supra at 494 n.7. "The Seabrook test focuses on a comparison of plaintiff's trade dress to others in the same class of goods, not on the trade dress's impact on consumers." Stuart Hall Co., Inc. v. Ampad Corp., supra at 786-87.[4]

---

[4]As to one aspect of trademarks or trade dress -- namely, color -- the Supreme Court has held that "no mark can ever be inherently distinctive." Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 211-12 (2000), citing Qualitex Co v. Jacobson Products Co., 514 U.S. 159, 162-63 (1995). "[C]olor [can] be protected as a trademark, but only upon a showing of secondary meaning * * *," as "a product's color is unlike a 'fanciful,' 'arbitrary,' or 'suggestive mark,' since it does not 'almost automatically tell a customer that [it] refer[s] to a brand,' * * * and does not 'immediately * * * signal a brand or a product "source" * * *.'" Id. at 212, quoting Qualitex Co v. Jacobson Products Co., supra at 162-63. However, since a color could, over time, be treated by customers as "signifying a brand," or as indicating a product's origin, color can be protected upon a showing of secondary meaning. Id. at 212.

Similarly, "design, like color, is not inherently distinctive." Id. at 212. As the Court explained:

> In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product design -- such as a cocktail shaker shaped like a penguin -- is intended not to identify the source, but to render the product itself more useful or more appealing.

Id. at 213.

Thus, "product design cannot be protected under §43(a) without a (continued...)

Having closely reviewed the Record presented, and particularly the photographs of the establishments in contest, we conclude that Freshway has not shown that its trade dress -- its "total image of a product, the overall impression created, not the individual features * * *[,]" Children's Factory, Inc. v. Benee's Toys, Inc., supra at 494, quoting Insty*Bit, Inc. v. Poly-Tech Indus., Inc., supra at 667 -- is inherently distinctive.[5] Although Freshway asks us to conclude that its trade dress is either suggestive, arbitrary, or fanciful, because it "identifies a particular source from

---

(...continued)
showing of secondary meaning." Id. at 214.

The decor of a restaurant is not product design, however, but rather product packaging, "or else some *teritum quid* that is akin to product packaging * * *." Id. at 215, distinguishing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). In cases where it is a close call, as to whether something is product design or product packaging, "courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." Id. at 215.

[5]In its brief, Freshway appears to rely heavily on its trademark, and accompanying design, to argue that its trade dress is inherently distinctive. See, Plaintiff's Brief in Support of Motion for Preliminary Injunction, at 6 ("Plaintiff's Brief")("The term 'Freshway Food System" along with its design * * * identifies a particular source from which their food originates."). However, as we have already observed, Freshway's request for injunctive relief is only directed at its trade dress, which encompasses more than just its trademark and design. Moreover, it is well established that, except for a couple deviations that Henry's has rectified, Freshway's trademark and design were removed from the establishments that are now identified as aligned with Deli-Max. As a result, Freshway's dominant reliance on its trademark is misplaced.

which their food originates," Plaintiff's Brief, at 6, we disagree, and find that the trade dress identifies the product itself. The "look" of Freshway's trade dress -- including the use of awnings to display food category choices, product placement on the food counters, and bulletin board menus -- was clearly constructed with the type of product in mind.

In fact, the overall look of Freshway's trade dress, in the noted eight stores, appears to be dictated by the type of product Freshway is selling -- fast food style products in a convenience store setting. There is nothing about its look which appears, in any form, as being suggestive, or as would "require[] some measure of imagination to reach a conclusion regarding the nature of the product." Insty*Bit, Inc. v. Poly-Tech Indus., Inc., supra at 673 n.12. More clearly, the trade dress was not "invented solely for [Freshway's] use as * * * trade dress," and it is, therefore, not arbitrary or fanciful. Id. at 673 n.11.

Moreover, it is clear that, under the test enunciated in Seabrook Foods, Inc. v. Bar-Well Foods Ltd, supra, Freshway's trade dress is really no different than some of its competitors. See, Ex. 2 to Defendant's Brief (picture of a Picadilly franchise which, on this Record, has had no previous association with Freshway, or Henry's); Ex. 5 to Defendant's Brief (picture of a Chester Fried Chicken Program which, again on this Record, has had no prior

association with Freshway or Henry's); Ex. 6 to Defendant's Brief (picture of a Hot Stuff franchise); Exs. 32A, 32B, and 32C to Defendant's Brief (picture of a non-branded store in Morton, Minnesota); Ex. 32E to Defendant's Brief (picture of a non-branded store in Brainerd, Minnesota). Rather, many of Freshway's competitors, especially franchises like Picadilly, and Hot Stuff, employ variations on a common theme -- a counter, awnings, and bulletin board menus for ordering, all in the same or similar layout. While the paper menus, the menu items, and the "Frequent Buyer" punch cards, may or may not be unique, they are only a few aspects of the whole appearance or "look," which, on average, is not distinctive.

While we recognize that the Supreme Court has implicitly determined that a restaurant's trade dress can be inherently distinctive, see, Two Pesos, Inc. v. Taco Cabana, Inc., supra at 770-76,[6] we find the present Record to be less than even the sparse facts, which were recited by the Court in Two Pesos. There, the alleged trade dress at issue consisted of the following:

---

[6]In Two Pesos, the Court expressly declined to determine whether the trade dress at issue was inherently distinctive. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 770 (1992). Rather, the Court noted that the issue, as to whether the particular trade dress was "inherently distinctive," was not before the Court, and therefore, the Court assumed, without deciding, that the asserted trade dress was in fact "inherently distinctive." Id.

> [A] festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme.

Id., quoting Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1117 (5th Cir. 1991).

In contrast, here, Freshway has simply referred us to their "unique retail environment which includes an open store design so that customers can see product categories from the moment they enter the store, a unique combination of fixtures, displays, locations, and a menu heretofore not utilized by any other retail company," Complaint, at ¶5, and, more specifically, to their use of awnings, color scheme, menu design, price structure, ingredient labels, and "Frequent Buyer Club" punch cards. These elements, however, describe many of the same type of convenience store, food service vendors, and Freshway has failed to distinguish its trade dress further. In sum, given this Record, we conclude that Freshway's trade dress is best characterized as descriptive.

Since Freshway's trade dress is merely descriptive, Freshway is obligated to demonstrate that its trade dress has acquired a secondary meaning. See, Stuart Hall Co. v. Ampad Corp., supra at 785. Freshway must, therefore, show "that by long and exclusive