use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others." Aromatique, Inc. v. Gold Seal, Inc., supra at 870. The proper inquiry is whether Freshway's trade dress identifies it, even if its trademark, and accompanying design, are illegible or obscured. Id. The paramount consideration is "'whether in the consumer's mind the mark has become associated with a particular source.'" Id. at 871, quoting Co-Rect Prods. v. Marvy! Advertising Photography, Inc., supra at 1332-33. The particular source need not be known by name, in the mind of the consumer, however. See, Stuart Hall Co., Inc. v. Ampad Corp., supra at 789. Relevant factors, in the secondary meaning determination, include "consumer surveys, deliberate copying of the mark, advertising featuring the trade dress at issue, expenditure on such advertising, and anecdotal evidence showing consumer identification of the trade dress with its source." Id., citing Aromatique, Inc. v. Gold Seal, Inc., supra at 871.

On this factor, Freshway has advanced no showing whatsoever. The only statement, that Freshway included in its initial brief concerning "secondary meaning," was that, "through its marketing and advertising of 92 stores over the past eight years, the mark has acquired secondary meaning * * *." Plaintiff's Brief, at 8.

Freshway also points to the fact that its trademark, and design, has been used exclusively, and continuously, for five years.[7] Id. As to its advertising budget, which Freshway represents was $270,000.00 over the past five years, see, Deposition of Joan Goddard, at 211-12, Ex. 34 to Defendant's Brief ("Goddard Deposition"), we have no information beyond that number. Rather, Goddard explained that the referenced budget includes the promotion of its

[7]Freshway points out that, under Title 15 U.S.C. §1052(f), the trademark commissioner may accept proof of five years' exclusive and continuous use of a mark as prima facie evidence of secondary meaning. See, Plaintiff's Brief, at 8, quoting Stuart Hall Co., Inc. v. Ampad Corp., 51 F.3d 780, 789 (8th Cir. 1995). Freshway first registered its trademark, and design, in 1993, and has, therefore, had more than five years of continuous and, we assume, exclusive use of the mark. See, Ex. A to Plaintiff's Brief. It has not presented similar evidence, however, with respect to its trade dress. Rather, it appears that Freshway does not even use the same layout, or color scheme, in each of its stores. See, Ex. 28 to Defendant's Brief (printout of a page of Freshway's website, explaining that it can customize a look based on cost, space requirements, and existing color scheme); Deposition of Joan Goddard, at 98-101, attached as Ex. 34 to Defendant Henry's Foods, Inc.'s Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction (explaining that Freshway customizes its commercial appearance in accordance with the needs, or desires, of a given store owner). Moreover, we can find no authority for the proposition that the mere fact that Freshway has trademarked its name --"Freshway Food Systems" -- and its logo design, see, Ex. A to Plaintiff's Brief, constitutes prima facie evidence as to its trade dress. Therefore, Freshway has not proffered prima facie evidence as to the secondary meaning of its trade dress and, even if it had, that would only be one of the factors to consider. See, Stuart Hall Co., Inc., v. Ampad, Inc., supra at 789 ("Stuart Hall's exclusive and continuous use of its trade dress for a period of time that creates a statutory presumption of secondary meaning for trademark registration weighs in favor of finding of secondary meaning * * *.").

product not only to end consumers, but also to franchisees. Id.; see also, Aromatique, Inc. v. Gold Seal, Inc., supra at 872 (concluding that articles published in trade journals are irrelevant, because they are not read by the ordinary consumer).

Further, we have been presented with no evidence of what was marketed by these advertisements -- whether they related to the price of the food, the convenience of the stores, the look of the stores, or perhaps, the location of the stores, or the flexibility afforded a store owner in selecting his own color scheme or design. As our Court of Appeals explained in Aromatique, in which it determined that advertising, in the amount of $250,000.00, was "probably too low to accord it much probative value:"

> Expenditures on advertising and promoting a trademark may be relevant to a determination of secondary meaning because the amount spent may be indicative of the extent to which the public associates the advertised mark with the source of the product bearing the mark.

Id.

However, there, since travel expenses had no bearing on the public's association with the mark, those expenses could not be considered. Id. at 872.

The same rationale is applicable here, for we know nothing about the specifics of Freshway's advertising. Moreover, if the advertisement focuses on Freshway's trademark, and design, those advertisements, too, are not probative of the consumer's appreci-

ation, or discernment of Freshway's trade dress. Id. at 871 ("The advertisements submitted with the application cannot establish secondary meaning because they do not separate the claimed dress of the products from the other marks that serve to identify the products as those of Aromatique."). As a result, given the dearth of evidence of secondary meaning, and because we conclude that Freshway's trade dress is not "inherently distinctive," we are unable to conclude that Freshway has shown any likelihood that it will be able to prove that its mark is distinctive. Consequently, Freshway has failed to show that it is likely to succeed on the merits of its trade dress claim, as distinctiveness is a necessary element of that claim, under the Lanham Act. Nonetheless, we continue in our analysis so as to determine whether Freshway's trade dress is non-functional, and whether there is a likelihood of confusion.

b. Functionality. A showing that a product or design is non-functional has long been required in order to receive protection as trade dress. "'[A] product feature is functional,' and cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" TrafFix Devices, Inc. v. Marketing Displays, Inc., supra at 32, quoting Qualitex Co v. Jacobson Products Co., 514 U.S. 159, 165 (1995), quoting in turn Inwood Labs., Inc. v. Ives Labs., Inc., supra at 850 n.10. Stated otherwise, "trade dress is non-

functional if it is an arbitrary embellishment primarily adopted for purposes of identification and individuality." Aromatique, Inc. v. Gold Seal, Inc., supra at 873. "In assessing functionality, the appropriate inquiry is whether the collection of design elements, taken as a whole, are functional, not whether individual elements of the trade dress could be categorized as such." Insty*Bit, Inc. v. Poly-Tech Indus., supra at 673, and cases cited therein.

The concern with functionality is related to an attempt to protect appropriate competition. Thus, "a functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." TrafFix Devices, Inc. v. Marketing Displays, Inc., supra at 32, quoting Qualitex Co v. Jacobson Products Co., supra at 165; see also, Two Pesos, Inc. v. Taco Cabana, Inc., supra at 775 ("[A] design is legally functional, and thus unprotectable, if it is one of a limited number of equally efficient options available to competitors and free competition would be unduly hindered by according the design trademark protection."). As such, "trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products," TrafFix Devices, Inc. v. Marketing Displays, Inc., supra at 29. "[U]nless an intellectual property right such as a patent or copyright protects an item, it will be

subject to copying," and "copying is not always discouraged or disfavored by the laws which preserve our competitive economy." Id., citing Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 160 (1989).

When Congress amended the Lanham Act, it provided that, "[i]n a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional." Title 15 U.S.C. 1125(a)(3); see also, TrafFix Devices, Inc. v. Marketing Displays, Inc., supra at 32 ("[T]he party asserting trade dress has the burden to establish the nonfunctionality of alleged trade dress."). Thus, "the burden of proof gives force to the well-established rule that trade dress protection may not be claimed for product features that are functional." TrafFix Devices, Inc. v. Marketing Displays, Inc., supra at 29.

Overall, Freshway's asserted trade dress -- including the combined use of the cooking equipment, awnings, counter tops, bulletin board menus, and sneeze guards -- appears to be functional. See, e.g., Prufrock Ltd., Inc. v. Lasater, supra at 133 (finding that a trade dress which included an exposed kitchen area, a large open dining area, and various decor items, which gave the restaurant a "country feel," was functional); Rally's, Inc. v. International

Shortstop, Inc., 776 F. Supp. 451 (E.D. Ark. 1990)(finding that items of trade dress, such as the color red and light beige, outdoor awnings, and backlighting on awnings, were functional). Clearly, the cooking equipment, counter tops, and sneeze guards, are typical, and necessary, accouterments in convenience store food services. Further, in the type of setting in which Freshway stores are located, the use of awnings, and an open store design, appears to be dictated by the fact that the convenience stores sell not only food items, but also a variety of other grocery, and non-grocery products, so that it is necessary to highlight the different products that are available to the customer. As to the paper menus, which Freshway emphasizes as reflecting Deli-Max's infringement of its trade dress, Goddard explained that the menus are employed by the stores to ensure that customers pay for their food items, and to allow the stores to reconcile their accounts at the end of each day. Goddard Deposition, at 103-04, Ex. 34 to Defendant's Brief. Consequently, many, if not most, of the items, which have been identified by Freshway for these purposes, appear to be predominantly functional.

There are, nonetheless, elements of Freshway's trade dress which can be deemed to be nonfunctional, and the overall use of the various functional items may well be nonfunctional overall. As already noted, trade dress is deemed nonfunctional when it is "an

arbitrary embellishment primarily adopted for purposes of identification and individuality." Aromatique, Inc. v. Gold Seal, Inc., supra at 873. In this case, those items could include the various color schemes, the "Frequent Buyer Card," and the paper menu color, and design. While we are clearly required to analyze the trade dress as a "collection of design elements, taken as a whole," see, Insty*Bit, Inc. v. Poly-Tech Indus., supra at 673, it appears that Freshway's trade dress includes both functional and nonfunctional elements. Moreover, as our Court of Appeals has stated, "individual format and design elements of [plaintiff's trade dress] may be nonfunctional under the standard explained in Aromatique, even if such elements as lines on which to write appointments throughout the day are not." Stuart Hall Co., Inc. v. Ampad Corp., supra at 790.

The issue of functionality presents a closer question than others. Nonetheless, as Freshway has the burden of proof on the issue, we conclude that it has not carried its burden, in seeking a Preliminary Injunction, by showing that its trade dress is non-functional. Again, as with the element of distinctiveness, Freshway has not shown that it is likely to succeed on the merits of its trade dress claim, as non-functionality is a necessary element under the Lanham Act. We turn, nonetheless, to the final element

essential to a showing trade dress infringement -- the likelihood of confusion.

c. Likelihood of Confusion. The potential for confusion is at the core of trade dress law. "The ultimate inquiry always is whether, considering all the circumstances, a likelihood exists that customers will be confused about the source of the allegedly infringing product." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., supra at 602, and cases cited therein. To determine the likelihood of confusion, our Court of Appeals has delineated six factors which we must consider, see, id., and the failure to complete such an analysis constitutes reversible error, see, Insty*Bit, Inc. v. Poly-Tech Indus., Inc., supra at 669-70 ("We consider each factor in turn, noting that although no one factor is determinative, each must be analyzed.").

The relevant factors -- termed the "Co-Rect" factors, see, Co-Rect Prods., Inc. v. Marvy! Advertising Photography, Inc., supra at 1330 -- include the following:

(1) The strength of the mark;

(2) The similarity between the owner's mark and the alleged infringer's mark;

(3) The degree to which the products compete with each other;

(4) The alleged infringer's intent to "pass off" its goods as those of the owners;

(5) The incidents of actual confusion; and

(6) The type of product, its costs, and conditions of purchase.

See, e.g., Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., supra at 602; Children's Factory, Inc. v. Benee's Toys, Inc., supra at 494; Insty*Bit, Inc. v. Poly-Tech Indus., Inc., supra at 667. No one factor is dispositive. See, e.g., General Mills, Inc. v. Kellogg Co., supra at 626.

Freshway frames its argument on this issue by directing us to the photographs which depict two store displays, first as a Freshway outlet, and then, later, as a Deli-Max. See, Exs. 2A, 2B, 3A, 3B. Admittedly, the displays appear largely identical, except for the trademark, and symbol, depicting either Freshway or Deli-Max logo. However, a "[v]isual inspection is permissible as an aid to a district court's determination of likelihood of confusion, but should not constitute the sole basis for the conclusions made." Insty*Bit, Inc. v. Poly-Tech Indus., Inc., supra at 670, quoting Woodsmith Publishing Co. v. Meredith Corp., 904 F. 2d 1244, 1247 (8th Cir. 1990). Although Freshway has given lip-service to the Co-Rect factors, aside from the pictures, it has provided no evidence on this issue. Necessarily, we analyze what has been presented.

With respect to the strength of Freshway's trade dress, Freshway has pointed only to its advertising budget, and to the number of stores it operates. We have already addressed the topic of advertising and, as we previously observed, Freshway has proffered

no evidence as to how the money was expended on advertising, let alone who was the intended target audience. As to the number of stores Freshway operates, it is notable that Freshway has not employed a consistent design as its trade dress. See, Exs. 2, 3, 7, 9, 21, 22, 24, 26, 29, 30, 31 to Defendant's Brief. In fact, Goddard testified, at her deposition, that Freshway is flexible in its color schemes, and store layouts, in order the accommodate the thematic desires of each store owner. Goddard Deposition, at 211-12, Ex. 34 to Defendant's Brief. Finally, the fact that Freshway has maintained the same trademark, and design of its logo, is irrelevant in determining the strength of Freshway's trade dress, since there is no assertion that Deli-Max's trademark, or logo design, infringe upon Freshway's. On this Record, we are compelled to conclude that Freshway's trade dress is weak.

As for the second Co-Rect factor, which is the similarity between Freshway's trade dress, and that of Deli-Max, it is clear that, in those stores which have switched from Freshway to Deli-Max, Deli-Max has maintained the look of the Freshway display, and has only changed the name, trademark and logo. In addition, the menus presented in Freshway's Complaint, as well as the Frequent Buyer's Punch Cards, are quite similar to those employed by Deli-Max. Apart from the fact that Freshway has adopted many different types of store displays, with different appearances, we find that

this factor tips, ever so slightly, in Freshway's favor, at least with respect to the eight stores which are presently at issue.

Next, as for the degree of competition between the two products, although Henry's argues that its type of business is quite different from Freshway's, as Henry's presently is, and has been, in the business of supplying retail outlets with a variety of goods, rather than Freshway's limited food-service franchise, we find that, if we are looking at apples and apples, the competition between the two is direct and intensive. Both sell fast-food type products, such as pizzas and sandwiches, in convenience store locations. Moreover, much of both of their businesses are located in Minnesota. Accordingly, this factor also tips toward Freshway.

The fourth factor relates to Henry's intent to pass off its goods as Freshway's. Of course, due to Freshway's and Henry's prior business relationship, there is a potential for an "inference of intent * * * because '[s]uch relationship provides evidence of the alleged infringer's intent to trade on the plaintiff's goodwill.'" Insty*Bit, Inc. v. Poly-Tech Indus., Inc., supra at 671. There is a distinctively different consideration here, however, as seven of the eight stores, which switched from being a Freshway to a Deli-Max, had a previous relationship with Henry's, as Henry's supplied other goods to those stores. Moreover, it appears that the reason that the Deli-Max stores kept the "look" left behind by

Freshway, when those stores converted to Deli-Max, was because Freshway did not require, by contract or other legal means, the store owners to change that "look."

As we observed during the course of the Hearing, if that "look" was sufficiently proprietary to Freshway, one would have thought that the proprietary interest would have been exclusively reserved, by contract, to the stores which exclusively sold Freshway products. Since the store proprietors owned the components of the food service area, we are aware of no requirement, absent a contract or the protections of trademark law, which would require those store owners to alter the appearance of the displays they chose, at Freshway's invitation, simply because the owners severed their ties with Freshway. If Freshway has a grievance, in this respect, it would seem to rest with the store owners, and not with Deli-Max. We do not overlook the fact, that Deli-Max's menu items and design, ingredient lists, and labels, bear a close resemblance to Freshway's, see, Exs. 5a, 5b, 6a, 6b, 6c, 7a, but overall, there is only slight evidence supporting Freshway's concern over the likelihood of confusion.

Next, we consider the incidents of actual confusion. As to this factor, Freshway appears to concede that it does not have evidence of actual confusion, as the only reference, in its brief, is an accurate statement of the governing law; namely, evidence of

actual confusion is not necessary for a finding of likelihood of confusion. See, e.g., Stuart Hall Co. v. Ampad Corp., supra 790-91. It is, however, a factor, and perhaps the strongest basis upon which to demonstrate a likelihood of confusion. Id., quoting Mutual of Omaha Ins. Co v. Novak, 836 F.2d 397, 400 (8th Cir. 1987). There is absolutely no showing of actual confusion in this case and, therefore, this factor weighs against Freshway.

Lastly, we consider the type of product, its cost, and the conditions of purchase. It is important to remember, however, that Freshway has limited it Motion for a Preliminary Injunction to the end consumers, so the product being purchased is relatively cheap -- sandwiches, salads, pizza, and the like. Factors such as the inexpensive nature of the product, and the limited time a consumer would devote to making a purchase decision, weigh in favor of a finding of likely confusion. See, Insty*Bit, Inc. v. Poly-Tech Indus., Inc., supra at 672. In reviewing the conditions of the purchase transaction, we look at "the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchases usually give in buying that class of goods." General Mills, Inc. v. Kellogg Co., supra at 627, quoting Scott v. Mego Int'l, Inc., 519 F. Supp. 1118, 1133 n.17 (D. Minn. 1981). Clearly, this factor favors Freshway. The products being sold are inexpensive, and the consumers are not about to spend much

time in making their purchase decision. Moreover, the consumers, here, would seem to be a captive audience, since the food displays are largely in convenience stores, which also markets gas or other products, so if a consumer comes in to buy gas, and wants something to eat, his or her options are limited.

In all, while some of the Co-Rect factors point toward a likelihood of confusion, there is certainly no strong showing of likely confusion. Moreover, since we have already found that Freshway can not show that its trade dress is distinctive, which is necessary under the Lanham Act, and it is questionable whether the dress is non-functional, we conclude that Freshway has failed to carry its burden of showing a likelihood of success on the merits. We similarly conclude that Freshway is unable to satisfy the remaining factors which would commend a Preliminary Injunction. Cf., Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., supra at 603 (concluding there was no showing of irreparable harm where plaintiff failed to show likelihood of confusion, and stating that "the balance of hardships and the public interest[] are unconvincing and cannot overcome Hubbard's failure to show a probability of success on the merits"). Nevertheless, in the interests of completeness, we briefly address the remaining Dataphase factors.

2. The Threat of Irreparable Harm to Freshway.

For the most part, Freshway's failure to show any appreciable likelihood of confusion negates its claim of irreparable harm. Id. Specifically, there is no proof, and only a weak illusion to the fact, that customers are confusing the Deli-Max stores with those of Freshway, and there is absolutely no contention that such confusion has, somehow, negatively affected Freshway. Moreover, as the focus of this Motion is the eight stores which have already switched from Freshway to Deli-Max, there is no evidence that Deli-Max is actively seeking to lure Freshway franchisees to the Deli-Max product. On the whole, Freshway has presented no evidence of a threat of irreparable harm. Thus, on the Record presented, there appears to be no need to preserve the status quo, see, Dataphase Sys., Inc. v. CL Sys., Inc., supra at 113, and the normal legal process is adequate for Freshway's asserted injuries.

As a consequence, in addition to the fact that Freshway has failed to satisfy its burden of showing a likelihood of success on the merits, it has also failed to show a threat of irreparable harm, and its Motion for Preliminary Injunction must, therefore, be denied. See, e.g., Gelco Corp. v. Coniston Partners, 811 F.2d 414, 420 (8th Cir. 1987)("Once a court determines that the movant has

failed to show irreparable harm absent an injunction, the inquiry is finished and the denial of the injunctive request is warranted.").

3. The Balance of Harm and the Public Interest.

Again, for the sake of completeness, we briefly note that Freshway has failed to satisfy its burden of showing that the remaining two Dataphase factors -- the balance of harm, and the public interest -- weigh in its favor. First, due to the lack of evidence in the Record, we can discern no harm to Freshway that would arise from the denial of their Motion for preliminary relief. More importantly, though, if we were to grant Freshway's Motion, the focus of our Order would, of necessity, not be on Henry's conduct, but rather, the conduct of the individual store owners, in the eight stores at issue.

At the Hearing, for the first time, Freshway defined the contours of its request for a Preliminary Injunction, and stated that it wanted an Order similar to that issued in Country Inns & Suites By Carlson, Inc. v. Two H.O. Partnership, supra at *4. There, the plaintiff, Country Inns & Suites by Carlson ("CIS"), had sued a former franchisee, and sought a Preliminary Injunction. Id. at *1. The plaintiff and the defendants had previously entered a franchise agreement, since 1992, which was terminated, by the plaintiff, in June of 2001. Id. Nonetheless, while the defendants no longer had

a license to use the CIS marks, they continued to use signs which employed a design similar to the CIS marks. Id. As a result, the plaintiff sued for an infringement of its trademarks, service marks, and trade dress. Id. In its Order granting the plaintiff's Motion for a Preliminary Injunction, the Court delineated the scope of its Order as follows:

> 1. Defendants, their agents, representatives, and all persons in active concert with them are enjoined from using any trademarks and service marks owned by Country Inns & Suites by Carlson, Inc. ("the CIS marks"), or any other name, designation or mark that is deceptively or confusingly similar to, or likely to cause confusion with, any of the CIS marks;
>
> 2. Defendants are ordered to alter or remove: (a) the pylon sign in front of the hotel at 1204 Seventh Avenue, Two Harbors, Minnesota ("the Hotel"); (b) the parking lot entrance at the Hotel; and (c) the billboard referenced in the Schindler Affidavit and the Kopeska Affidavit, in such a way so that none of these signs are deceptive or confusingly similar to, or likely to cause confusion with, any of the CIS marks;
>
> 3. Defendants shall file with the Court and serve on plaintiff's counsel, within thirty (30) days of the date of filing of the required bond, a report in writing and under oath, setting forth in detail the manner and form in which defendants have complied with the preliminary injunction;
>
> 4. In accordance with [Federal Rule of Civil Procedure] 65(c), the preliminary injunction shall become effective upon plaintiff's posting a bond with the Clerk in the amount of Two

> Thousand Dollars ($2,000) for the payment of such costs and damages as may be incurred or suffered by defendants in the even defendants are found to have been wrongfully enjoined.

Id. at *4.

In seeking a similar Order here, Freshway, by every appearance, would require the individual stores to either stop utilizing Deli-Max -- or any other type of deli-style food service -- or to re-design their store layouts so as to rid themselves of the offending items, which Freshway contends constitutes it trade dress -- the use of awnings, an open store design, the equipment package, etc.

Of course, the distinction between this case and County Inns & Suites by Carlson, Inc. v. Two H.O. Partnership, supra, is that our Order would affect, in large part, the individual store owners, who are not being sued, at least at this point by Freshway, and who are not parties, here, so as to defend their own financial interests, which could be substantially impaired by a grant of the Motion for a Preliminary Injunction. This is particularly notable since the store proprietors are the rightful owners of the components of their food service areas, and Freshway never demanded that the store proprietors discontinue using any aspect of the general design of the food service area -- other than the Freshway trademark and logo -- after any agreement, between Freshway and the store proprietor should end.

Moreover, the defendants in Country Inns & Suites by Carlson, Inc. v. Two H.O. Partnership, supra, were not required to discontinue operating their hotel; they merely had to remove the signage which was similar to those employed by CIS. Here, in contrast, the store proprietors would, quite conceivably, be required to stop using their deli-food areas, or be compelled to completely redesign their stores. On such an insubstantial showing of harm to Freshway, the remedy Freshway requests would plainly be draconian. Thus, not only has Freshway failed to show that it will be irreparably harmed by the continued use, in the eight stores at issue, of the food service area previously occupied by Freshway, and now occupied by Deli-Max, but harm would befall individuals -- the store owners -- who are not litigants in this case. As such, we find that Freshway has failed to show that the balance of harms, or the public interest, commend our grant of its Motion for a Preliminary Injunction.

In sum, having filed to satisfy the Dataphase factors, we deny Freshway's Motion for a Preliminary Injunction.

NOW, THEREFORE, It is --

ORDERED:

That the Plaintiff's Motion for a Preliminary Injunction [Docket No. 40] is DENIED.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE